IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

RONALD H. KRAMER,

        Plaintiff,                No. 1:13-cv-00340-PA

        v.                         **ORDER**

SOUTHERN OREGON UNIVERSITY, a
public university, OREGON
UNIVERSITY SYSTEM, a public
university system, MARY CULLINAN,
GEORGE PERNSTEINER,

        Defendants.

**PANNER, District Judge:**

    This matter comes before me on Defendants' Motion for Partial

Summary Judgment (#87), Plaintiff's Motion for Partial Summary

Judgment (#91), and Defendants' Motion for Leave to File an

Amended Answer (#84).  Defendants' Motion for Partial Summary

Judgment is GRANTED as to all claims except Plaintiff's due

1 - ORDER

process claim for violation of a liberty interest.  Plaintiff's
Motion for Partial Summary Judgment is DENIED.  Defendants' Motion
for Leave to File an Amended Answer is MOOT as to the proposed
eighteenth affirmative defense and GRANTED as to all other
proposed amendments.

### Background

Plaintiff Ronald Kramer ("Kramer") was a longtime employee of
Defendant Southern Oregon University ("SOU").  SOU is an public
university based in Ashland, Oregon.  During the relevant period
of this case, SOU's President was Defendant Dr. Mary Cullinan
("Cullinan").  SOU is part of Defendant Oregon University System
("OUS"), a public entity comprised of the Oregon public
universities.  During the relevant period of this case, Defendant
George Pernsteiner ("Pernsteiner") served as OUS Chancellor.

SOU runs a network of public radio station known as Jefferson
Public Radio ("JPR").  SOU is assisted in its running of JPR by
the Jefferson Public Radio Foundation ("JPRF").  SOU and JPRF
share ownership and control of the stations, licenses, equipment,
and facilities of the JPR network.

Kramer served as the Executive Director ("ED") of JPR.  In
that capacity, he was an employee of SOU.  As part of the
contractual arrangement between SOU and JPRF, the Executive
Director of JPR also served as the Executive Director of JPRF.
Accordingly, Kramer was ED of both organizations for a number of
years.  This dual role was incorporated into Kramer's job

2 - ORDER

description at SOU.

In 2011, SOU President Cullinan became concerned about new projects being undertaken by JPRF, including the renovation of the Holly Theater in Medford, Oregon ("the Medford Projects"). Cullinan expressed her concerns to OUS Chancellor Pernsteiner.  In response to those concerns, Pernsteiner directed the Internal Audit Division of OUS to perform an Asset & Liability Review of JPR beginning in March 2011.

After conducting the Asset & Liability Review, the Internal Audit Division issued an Internal Audit Report on September 22, 2011 ("the OUS Report").  The OUS Report concluded that JPRF's Medford Projects "may not align with policy interests of SOU and may, in fact, harm SOU by limiting the fundraising ability of the SOU Foundation related to their own fundraising priorities." Rubin Decl. Ex. 1, at 10.  The OUS Report also concluded that having a single individual serving as the ED of both JPR and JPRF represented a structural problem in the relationship between SOU and JPRF, resulting in "recurring actual or apparent conflicts of interest." Id. at 11.  The OUS Report recommended that SOU eliminate the conflict of interest by not allowing Kramer to serve as ED of both organizations. Id. Cullinan accepted the recommendations in the OUS Report and commissioned a task force to resolve the issues identified in the OUS Report.  In early 2012, Kramer came to believe that he was going to be terminated as a consequence of the OUS Report.  On March 21, 2012, Kramer filed a

grievance with SOU.  The SOU grievance committee rejected Kramer's complaint on the basis that there had been no grievable employment action.  In the meantime, Kramer remained in his position as ED of both JPR and JPRF.

On March 16, 2012, Kramer prepared and distributed a series of proposed resolutions for the JRPF Board which would have fundamentally altered JPRF's relationship with SOU.  The JPRF Board was scheduled to consider and vote on those resolutions at a meeting on March 22, 2012.  As SOU President, Cullinan also received a copy of the proposed resolutions.

SOU and OUS viewed the proposed resolutions as detrimental to SOU and retained the Miller Nash law firm to prevent the proposed resolutions from being adopted.  On March 22, 2012, counsel from Miller Nash prepared a letter addressed to JPRF counsel Jerry Jacobson ("the Miller Nash Letter").  The Miller Nash Letter set forth SOU's opposition to the proposed resolutions and advised that SOU would proceed with litigation if the resolutions were adopted.  Rubin Decl. Ex 1, at 2.  The threat of litigation included claims against JPRF, the JPRF Board members personally, and Kramer in particular.  Id. at 3-5.  Claims against Kramer were to include breaches of fiduciary duties to SOU, interference with contract, impermissible direct and indirect conflicts of interest without the required disclosures, and violations of the standards of conduct for officers of nonprofit corporations.  Id. at 4-5.  The Miller Nash Letter also notes that Kramer and the JPRF Board

4 - ORDER

may be denied indemnity by JPRF's insurance company if it is found that their actions were taken in bad faith or through willful misconduct. Id. at 5-6. Jacobson was asked to provide copies of the Miller Nash Letter to the JPRF Board in advance of the March 22 meeting.

The JPRF Board met as scheduled on March 22, 2012. Members of the local media attended the open session. Cullinan gave a speech urging the board to reject the resolutions and consider mediation. Moore Decl. Ex. 7. Cullinan referred to the Miller Nash Letter, although she did not go into detail about the contents of the letter. Id. The JPRF Board went into executive session, during which it rejected the proposed resolutions.

On March 23, 2012, Cullinan sent Kramer a letter informing him that his appointment as ED of JPR "may not be renewed for the upcoming 2012-2013 fiscal year," and that "[a]s a result, your employment with Southern Oregon University may terminate on June 30, 2012." Moore Decl. Ex. 9.

The dispute between SOU and JPRF was covered in local newspapers and generated considerable interest. On June 8 and 9, 2012, SOU and JPRF engaged in mediation, to which Kramer was not a party, and reached an agreement, subject to the to approval by the JPRF Board ("the Lukens Agreement"). After considering the matter, the JPRF Board rejected the Lukens Agreement.

On June 13, 2012, SOU adopted an amendment to its personnel policies. The new policy permitted SOU to terminate

5 - ORDER

administrative appointments without cause at any time during the appointment by providing the employee with ninety days notice prior to termination. Stephens Decl. Ex. 1.

On June 25, 2012, Kramer received a letter from Cullinan informing him that his employment was terminated effective June 30. Stephens Decl. Ex. 8. Kramer performed no work for SOU after June 25, 2012. On or about June 30, 2012, Kramer also stepped down from his position as ED of JPRF. Moore Decl. Ex 11, at 15.

On July 2, 2012, Kramer submitted a written grievance to SOU. Kramer grieved the sufficiency of his notice of termination and the allegations contained in the OUS Report and the Miller Nash Letter. Kramer also alleged that he had been terminated in retaliation for his earlier grievance. Stephens Decl. Ex. 9, at 2.

On August 17, 2012, the SOU Grievance Committee issued its findings. The Grievance Committee determined that Kramer did not receive proper notice of non-renewal until June 25, 2012, because the March 23 letter used conditional language. The Grievance Committee determined that Kramer had not been terminated for a retaliatory reason. The Grievance Committee also determined that, although the OUS Report and Miller Nash Letter were public documents, they were not placed in Kramer's personnel file and that disclosure would not violate SOU policy. Stephens Decl. Ex. 9. The Grievance Committee concluded Kramer was entitled to ninety days of pay and benefits beginning on June 25, 2012.

6 - ORDER

Following a "cooling off" period after the failure of the
Lukens Agreement, SOU and JPRF engaged in a second round of
mediation on August 21 and 22, 2012, conducted by a new mediator,
Susan Hammer. At the conclusion of the second round of mediation,
SOU and JPRF entered into a binding settlement agreement ("the
Hammer Agreement"). One of the terms of the Hammer Agreement was
that "Ron Kramer may serve as a volunteer consultant or
independent contractor consultant to [JPRF] or its affiliates but
is not eligible to be an officer, director, advisory board member,
or employee of [JPRF] or its affiliates." Moore Decl. Ex. 17., at
1. As part of the Hammer Agreement, SOU and JPRF extended their
contract for exchange of services without modification. JPR
employee Paul Westehelle was appointed to serve as the interim ED
of both JPR and JPRF in the same dual capacity previously occupied
by Kramer.

On September 11, 2012, Cullinan accepted the SOU Grievance
Committee's determination and Kramer received the recommended
ninety days of pay and benefits in a lump sum on October 22, 2012.
Kramer then filed this action.

## Legal Standard

### I. Summary Judgment

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). Whether or not a fact is material is determined by the

7 - ORDER

substantive law on the issue. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). There is a genuine dispute if the evidence is such that a reasonable jury would return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material facts should be resolved against the moving party; and (2) all inferences must be drawn in the light most favorable to the nonmoving party. T.W. Elec., 809 F.2d at 630-31.

## II. Qualified Immunity

Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Defendants are entitled to qualified immunity where they "reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information [that they] possessed.'" Cohen v. San Bernadino Valley Coll., 92 F.3d 968, 973 (9th Cir. 1996)(quoting Baker v. Racansky, 887 F.2d 183, 187 (9th Cir. 1989)).

The Supreme Court has established a two-part analysis for

8 - ORDER

determining whether qualified immunity is appropriate in a suit against an official for an alleged violation of a constitutional right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). The court must determine whether the official violated the plaintiff's constitutional rights on the facts alleged and whether the constitutional rights were clearly established. <u>Id.</u> The Supreme Court has since explained that a court can proceed through these steps in any order. <u>Pearson v. Callahan</u>, 555 U.S. 223, 242 (2009).

In order for a right to be "clearly established," its "contours must be sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2023 (2014). "'Existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" <u>Id.</u> (quoting <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011)).

## Discussion

### I. Defendants' Motion for Partial Summary Judgment

Defendants move for summary judgment on all claims against Cullinan and Pernsteiner. Defendants also move for summary judgment on Kramer's state law claims for blacklisting, breach of contract, and statutory wage and hour violations.

#### A. Due Process Liberty Interest

Kramer's third claim alleges that Cullinan deprived him of

the freedom to engage in his chosen occupation without due process
when she failed to provide him with a name clearing hearing before
the release of stigmatizing information contained in the OUS
Report and the Miller Nash Letter.

The Fourteenth Amendment's guarantee of due process applies
when a constitutionally protected liberty or property interest is
at stake. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564,
569 (1972). A liberty interest is implicated in the employment
termination context if 1) the employer makes a charge that impairs
the employee's reputation for honesty or morality; 2) the accuracy
of the charge is contested; 3) there is some public disclosure of
the charge; and 4) the charge is made in connection with
termination of employment. Matthews v. Harney Cnty., Or., Sch.
Dist. No. 4, 819 F.2d 889, 891-92 (9th Cir. 1987). Defendants
concede that, to the extent any charges were made, Kramer
contested their accuracy. Defendants contest all of the other
elements and assert that, even if Cullinan violated Kramer's due
process rights, those rights were not clearly established.

### 1. Stigmatizing Charge

To implicate a liberty interest, the charge "must be
sufficiently serious to 'stigmatize' or otherwise burden the
individual so that he is not able to take advantage of other
employment opportunities." Bollow v. Fed. Reserve Bank of San
Francisco, 650 F.2d 1093, 1101 (9th Cir. 1981). The charge must
be one of moral turpitude, such as dishonesty or immorality, and

not merely incompetence or a difficult personality.  Stretten v.

Wadsworth Veterans Hosp., 537 F.2d 361, 366 (9th Cir. 1976).

Courts must also "distinguish between allegations that may reduce

economic rewards and diminish prestige from those that may exclude

one permanently from the profession or trade or interrupt

employment for a protracted period of time."  Roley v. Pierce

Cnty. Fire Prot. Dist. No. 4, 869 F.2d 491, 496 (9th Cir. 1989).

In this case, Kramer contends that the OUS Report and the

Miller Nash Letter contain stigmatizing charges against him.  I

cannot conclude that the OUS Report makes any allegations about

Kramer that implicate moral turpitude.  There is no accusation of

improper motive or dishonest behavior.  The OUS Report simply

identifies Kramer's dual role as a structural defect in the SOU-

JPRF relationship at the time of Asset & Liability Review and

presents recommendations for correcting that issue.

The Miller Nash Letter, by contrast, alleges Kramer engaged

in impermissible direct and indirect conflicts of interest,

particularly in proposing a resolution which would have resulted

in his full-time employment by JPRF.  The Miller Nash Letter also

charges Kramer with breaches of his fiduciary duties to SOU and

violations of the standards of conduct for officers of Oregon

nonprofit corporations.  Rubin Decl. Ex. 1, at 5.

I am not persuaded by Defendants' argument that the Miller

Nash Letter's allegations are softened by being conditioned on the

passage of the proposed resolutions.  In discussing possible

11- ORDER

indemnification for Kramer or the directors under JPRF's insurance policy, the letter says:

> Nor do we see a clear path to indemnity.  Article X of the bylaws forbids indemnification for actions taken in bad faith or through willful misconduct.  If any actions of Kramer or the Foundation's directors (including past actions and the adoption of the Proposed Resolutions) are determined to have been made in bad faith or through willful misconduct, neither Mr. Kramer nor the Foundation's directors will be entitled to indemnification . . . .

Rubin Decl. Ex. 1, at 5-6.

The clear implication of this passage is that SOU believed that Kramer *had* engaged in willful misconduct or acted in bad faith and that, as a consequence, he had no "clear path" to indemnity.  Read in the light most favorable to the non-moving party, a reasonable jury could conclude that the Miller Nash Letter contained charges that impaired Kramer's reputation for honesty or morality and that such charges that would exclude Kramer from his chosen profession.[1]

As discussed above, it is well established that charges that impair a plaintiff's reputation for honesty or morality, as opposed to allegations of professional incompetence, will implicate the plaintiff's due process rights.  See, e.g., Tibbets v. Kulongoski, 567 F.3d 529, 537 (9th Cir. 2009); Bollow, 650 F.2d

---

[1]The parties dispute both the scope of Kramer's chosen profession and the degree to which he has been excluded from it. Even accepting a definition of Kramer's chosen profession broad enough to encompass radio or media, as opposed to the narrower "public radio in southern Oregon," the record supports Kramer's contention that he has been unable to find employment.

12 - ORDER

at 1101; Roley, 869 F.2d at 495-96; Stretten, 537 F.2d at 365-66.

Because I have concluded that, for the purposes of summary

judgment, the charges contained in the Miller Nash Letter

implicate Kramer's reputation for honesty, I also conclude that

the matter was clearly established at the time of the violation.

### 2. Publication

For a stigmatizing charge to implicate a constitutional

right, there must be "some public disclosure" of the stigmatizing

charges. Vanelli v. Reynolds Sch. Dist. No. 7, 667 F.2d 773, 777-

78 (9th Cir. 1982). Although the publication requirement of a

due process claim does not explicitly require that the employer

make the disclosure, "allow[ing] the potentially stigmatized party

to satisfy the publication prong by disseminating the details

surrounding his termination would contradict the purposes of the

publication requirement." Llamas v. Butte Cmty. Coll. Dist., 238

F.3d 1123, 1131 (9th Cir. 2001).

The exact contours of what constitutes publication are

somewhat indefinite. See Mustafa v. Clark Cnty. Sch. Dist., 157

F.3d 1169, 1179 n.10 (9th Cir. 1998). Obviously, an overt

disclosure of stigmatizing information to the media constitutes

publication. See Tibbetts, 567 F.3d at 536. Placement of

stigmatizing information in a personnel file can also constitute

publication when state law classifies an employee's personnel file

as a public record that must be produced on request. Cox v.

Roskelley, 359 F.3d 1105, 1112 (9th Cir. 2004).

13- ORDER

In Cox, the Ninth Circuit adopted the Eleventh Circuit standard of publication, holding that "'the presence of stigmatizing information placed into the public record by a state entity, pursuant to a state statute or otherwise, constitutes sufficient publication to implicate the liberty interest under the due process clause of the fourteenth amendment to the United States Constitution.'" Id. at 1111, (quoting Buxton v. City of Plant City, 871 F.2d 1037, 1046 (11th Cir. 1989)). "'[B]ecause the information in the file may be reviewed years after it is filed, its publication, for due process purposes, must be held to occur *at the time of filing*.'" Id.

The record supports Plaintiff's contention that both the OUS Report and the Miller Nash Letter were public documents. The SOU Grievance Committee concluded as much, saying "SOU and the Oregon University System were and remain obligated to provide these documents upon request to any member of the public." Moore Decl. Ex. 15, at 5. Cullinan herself concurred with the Grievance Committee's findings on this point. Moore Decl. Ex. 16.

Under Cox, therefore, the inclusion of stigmatizing charges in the Miller Nash Letter was sufficient to meet the publication requirement of Kramer's due process claim. This conclusion is bolstered by Cullinan's reference to the Miller Nash Letter in her March 22, 2012, speech to the JPRF Board. Not only was a stigmatizing public document created, but the media was affirmatively notified of that document's existence.

14 – ORDER

I must also conclude that the right was clearly established at the time of the violation. Cox stands for the proposition that placement of stigmatizing information in a publicly available document constitutes publication. The fact that the Miller Nash Letter was not placed in Kramer's personnel file, as were the stigmatizing charges in Cox, does not alter this analysis.[2]

### 3. Connection to Termination

Defendants argue that the Miller Nash Letter was unrelated to Kramer's termination and that it was too temporally distant from Kramer's ultimate termination on June 25, 2012 to support a due process violation.

A stigmatizing charge is connected to the termination "when defamatory statements are so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye." Campanelli v. Bockrath, 100 F.3d 1476, 1482 (9th Cir. 1996) Although the Ninth Circuit has declined to establish a bright-line rule, there must be "some temporal nexus" between the stigmatizing charges and the termination. Id. at 1483; Tibbets, 567 F.3d at 537. In Campanelli, a seven-to-nine day interval between termination and the publication of stigmatizing charges was found to be sufficient to establish a connection. Campanelli,

---

[2]Conversely, courts have found that placement of stigmatizing information in a personnel file does not constitute publication under Cox when the laws of the state do not require public disclosure of the personnel file upon request. Boggs v. Hoover, Civil No. 09-116-ST, 2009 WL 2447553 at *8 (D. Or. Aug. 6, 2009).

100 F.3d at 1483.

In this case, the Miller Nash Letter was delivered to the JPRF Board on March 22, 2012. On March 23, 2012, Cullinan informed Kramer by letter that he "may" be terminated, effective June 30, 2012. Moore Decl. Ex. 9. The record supports that Cullinan believed that the March 23 letter was effective notice of termination. Her June 25 letter, which was later determined to have actually been effective notice of termination, was sent to "confirm" the March 23 letter. Moore Decl. Ex 14. Cullinan also disputed the SOU Grievance Committee's determination that notice provided by the March 23 letter was defective. Moore Ex. 16.

Given that Cullinan initiated, or at least attempted to initiate, Kramer's termination only one day after publication of the Miller Nash Letter, I conclude that there is sufficient evidence that the stigmatizing charges were made in connection with Kramer's termination. Because Cullinan's actions were taken within the time frame established in Campanelli, I conclude that the matter was "clearly established" at the time of the violation.

I conclude there is sufficient evidence on each of the elements to sustain this claim. I also conclude Kramer's rights were clearly established at the time of the violation. Accordingly, Defendants' Motion for Summary Judgment on this claim is DENIED.

**B. Due Process Property Interest**

Kramer's third claim alleges that Cullinan deprived him of

16- ORDER

his property interest in a subsequent year of employment when he was terminated without proper notice.  Kramer contends that, absent ninety days notice, he was entitled to a full year of renewed employment with SOU.

Property interests do not arise from the Constitution, but are created and their dimensions defined by existing rules or understandings that stem from an independent source, such as state law.  Roth, 408 U.S. at 577.  Federal constitutional law, however, determines whether that interest rises to the level of a legitimate claim to entitlement protected by the Due Process Clause.  Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978).  While property rights can be created and defined by state law, the claimant must demonstrate that he has a legitimate entitlement to the claimed right and not merely a unilateral expectation.  Sanchez v. City of Santa Ana, 915 F.2d 424, 428 (9th Cir. 1990).  "'Although procedural requirements ordinarily do not transform a unilateral expectation into a protected property interest, such an interest is created if the procedural requirements are intended to be a significant substantive restriction on . . . decision making.'"  Stiesberg v. State of Cal., 80 F.3d 353, 356 (9th Cir. 1996)(quoting Wedges/Ledges of Cal., Inc. v. City of Phoenix, 24 F.3d 56, 62 (9th Cir. 1994)).  Under Oregon law, a non-tenured employee's right to continued employment is derived from contract and not the Constitution.  Papadopoulos v. Or. State Bd. Of Higher Educ., 14 Or. App. 130,

17- ORDER

169 (1973).

In this case, Kramer was a non-tenured university employee. Under Papadopoulos, his rights would be contractual, rather than constitutional. The Ninth Circuit has held, however, that deprivation of contractual rights can give rise to a due process violation, subject to the terms of the contract. Loehr v. Ventura Cnty. Cmty. Coll. Dist., 743 F.2d 1310, 1314 (9th Cir. 1984); San Bernadino Physicians Serv. Med. Grp. v. San Bernadino Cnty., 825 F.2d 1404, 1407-09 (9th Cir. 1987).

Kramer's appointment was classified as "renewable." Stephens Decl. Ex. 3. Under SOU's 2005 policy "Types of Appointment Notice of Non-Renewal and Resignation," renewable appointments "are considered 'renewed' for continuing employment in a subsequent fiscal or academic year for the same appointment term as the previous appointment unless the employee receives . . . notice of non-renewal." Moore Decl. Ex. 20, at 2. "A ninety (90) day notice of non-renewal is given to employees on renewable appointments with termination being effective at the end of the notice period." Id.

In Loehr, the Ninth Circuit determined that a statutory provision which provided for automatic renewal absent six month's notice of non-renewal did not create a protected property interest because the statute did not create a "significant substantive restriction" on the defendant's decision-making power in employment matters. Loehr, 743 F.2d at 1315. In addition, the

18 - ORDER

Ninth Circuit noted that the statute failed to provide an
"articulable standard" that would define such a restriction.  Id.

The facts of this case are closely analogous to those of
Loehr.  The terms of SOU's renewable appointment policy do not
significantly restrict SOU's ability to make decisions on renewal
of appointments like Kramer's.  Nor do the policies articulate any
standard that would define a restriction.  I must conclude,
therefore, that Plaintiff had no protected property interest in
his continued employment with SOU.

To the extent that a protected property interest may have
existed, I also conclude that the contours of the right were not
sufficiently definite in 2012.  Defendants are entitled to summary
judgment on this claim.

### C. Equal Protection

Kramer's fourth claim alleges that Pernsteiner violated
Kramer's right to equal protection when he endorsed a provision of
the Hammer Agreement that prohibited Kramer from being employed by
JPRF.

Kramer's claim relies on a "class of one" theory of equal
protection.  To prevail on an equal protection claim under the
"class of one" theory, a plaintiff must show that the official 1)
intentionally 2) treated the plaintiff differently than other
similarly situated individuals, 3) without a rational basis for
the difference in treatment.  Village of Willowbrook v. Olech, 528
U.S. 562, 564 (2000); Gerhart v. Lake Cnty., 637 F.3d 1013, 1022

(9th Cir. 2011).[3]  To prevail on the rational basis element of a "class of one" claim, "the burden is on the challenging party to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  Bd. of Trs. of Univ. Ala. v. Garrett, 531 U.S. 356, 367 (2001)(quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).

In this case, Kramer contends he was treated differently from Paul Westhelle, who was appointed to replace him in the same dual role that gave rise to the conflicts of interest identified in the OUS Report and the Miller Nash Letter.  As a preliminary matter, there is no evidence that Pernsteiner was directly involved with any of the terms of the Hammer Agreement.  On the contrary, the record suggests that he took a "hands off" approach to the second round of mediation, allowing the local representatives of SOU to resolve the issue.  Based on the record, it appears that Pernsteiner learned Kramer was barred from employment by JPRF only when the Hammer Agreement was made public.  Rubin Decl. Ex. 5, at 7-10.

In any event, Pernsteiner is entitled to summary judgment on the rational basis element of Kramer's equal protection claim. The record shows that Kramer's relationship with SOU had severely

---

[3]The Supreme Court has held that the "class of one" theory of equal protection does not apply in the public employment context.  Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607 (2008).  It is not necessary for me to resolve whether Pernsteiner's actions in this case were taken as a public employer or as a regulator.

deteriorated in the months leading up to the Hammer Agreement.
JPRF's mission, in the view of OUS and SOU, was to support SOU's
JPR enterprise.  It is reasonable that, in the interest of
returning to a smooth working partnership, SOU or OUS would have
insisted on the exclusion of the person perceived to be at the
center of the SOU-JPRF conflict.  Kramer has produced no specific
evidence to contradict this rationale.  I conclude, therefore,
that a rational basis existed for excluding Kramer from employment
with JPRF.[4]  Pernsteiner is entitled to summary judgment on
Kramer's claim against him.

Because Pernsteiner's actions did not constitute a violation
of Kramer's right to equal protection, I need not address whether
that right was clearly established.  Defendants' motion for
summary judgment on this claim is GRANTED.

### D. Blacklisting

Kramer's first claim for relief alleges a common-law claim
for blacklisting based on ORS 659.805.  Kramer alleges that
Defendants blacklisted him by adopting and publishing the Hammer
Agreement, which prevented him from being employed by JPRF.
Kramer alleges that this act shut him out of all prospect of

---

[4]At oral argument, Plaintiff's counsel argued that the term
prohibiting Kramer from being employed by JPRF was overbroad and
that SOU's concerns might have been addressed by limiting
Kramer's potential JPRF employment to the Medford Projects.
While counsel's suggestion is probably a more elegant solution
than what was included in the Hammer Settlement, the Constitution
does not require perfection.  Vance v. Bradley, 440 U.S. 93, 108
(1979).

employment as an Executive Director for a public radio
organization in the southern Oregon media market[5].

Defendants move for summary judgment on this claim,
essentially reiterating their argument that no common-law claim
for blacklisting exists under Oregon law.  This Court previously
rejected this argument at the motion to dismiss stage (#25), based
on the Oregon Supreme Court's decision in Johnson v. Oregon
Stevedoring Co., 128 Or. 121 (1928).  Nor is this the first time
that a federal court in Oregon has recognized the existence of a
common-law claim for blacklisting based on the Johnson decision.
Mink v. Marion Cnty. Juvenile Dept., Civ. No. 08-6298-AA, 2009 WL
5173513, *12-13 (D. Or. Dec. 18, 2009).

Oregon law prohibits an employer from "blacklisting" a
terminated employee.  ORS 659.805.  Blacklisting involves the
intent to injure a person by preventing future employment.  Mink,
2009 WL 5173513 at *12-13.  "[I]f one is prevented by the wrongful
act of a third party from securing some employment that he has
sought, he suffers a legal wrong, provided he can show that the
failure to employ him was the direct and natural consequence of
the wrongful act." Johnson 128 Or. At 135.  In Mink, the court
granted summary judgment on the plaintiff's blacklisting claim
after determining that there was no evidence of a "wrongful act"
or malicious intent.  Mink, 2009 WL 5173513 at *12-13.

―――――――――――――――――

     [5]Based on the record, it is clear that JPR and JPRF are the
only public radio entities in southern Oregon.


22 - ORDER

In this case, I have reviewed the entire record carefully. As in Mink, there is no evidence in this case that Defendants acted with the malicious intent to injure Kramer. The record shows Kramer voluntarily stepped down from his position as ED of JPRF before adoption of the Hammer Agreement. Moore Decl. Ex. 11, at 15. Furthermore, contrary to the allegations in the Amended Complaint, the Hammer Agreement does not completely prohibit Kramer from working for JPRF. The Hammer Agreement permits JPRF to employ Kramer as an "independent contractor consultant." Moore Decl. Ex. 17, at 1.

Accordingly, based on the record, I must conclude that Defendants are entitled to summary judgment on this claim.

### E. Breach of Contract

Kramer's fifth claim for relief alleges that Defendants breached their contract with Kramer by terminating him without the required notice. Defendants contend that on June 13, 2012,[6] SOU adopted an amendment to their employment policies which provided that administrative appointments could be terminated without cause at any time during the appointment period with ninety days written notice prior to the termination of employment. Under that policy, the only remedy to which Kramer would be entitled is the ninety

---

[6]The policy amendment, entitled "Administrator Appointment, Non-renewal, Resignation" and identified as Policy Number FAD 0.18, was approved on June 13, 2012. Stephens Decl. Ex 1, at 1. For the sake of clarity and consistency, I will refer to it as "the June 13 amendment."

days of pay and benefits already awarded by the SOU Grievance Committee and paid by SOU.

Defendants argue that, under Kramer's contract, any amendment to the SOU employment policies immediately amended the terms of Kramer's employment. Kramer would, therefore, have been subject to the June 13 amendment when he was terminated on June 25. Kramer contends that it is ambiguous whether the June 13 amendment was effective at the time of his termination because SOU failed to electronically circulate the policy, as Kramer contends it was required to do. Kramer argues that, absent that amendment, he would be entitled to the benefit of a subsequent year of employment.

When a contract is ambiguous, ascertaining its meaning is a question of fact and inappropriate for summary judgment. See Madison v. W. Or. Conference Ass'n of Seventh-Day Adventists, 209 Or. App. 380, 389 (2006).

Based on the record, I conclude Kramer received effective notice of his termination on June 25, 2012. I also conclude that the June 13 amendment applied to Kramer's appointment at the time of his termination. Although Kramer argues SOU was required to electronically circulate any amendments to its employment policies prior to their adoption, he is able to provide only his own declaration and deposition testimony that such a requirement was his understanding. Kramer Decl., at 2; Moore Decl. Ex. 1, at 185-86. Kramer's understanding is not supported by the express terms

of SOU's employment policies.  The 2005 policy "Types of Appointment Notice of Non-Renewal and Resignation," which Kramer contends was effective at the time of his termination, explicitly says "[t]his policy may be revised at any time without prior notice.  All revisions supercede prior policy and are effective upon approval."  Moore Decl. Ex. 20, at 2.

Kramer's employment contract also supports Defendants' contention that the June 13 amendment was effective at the time of Kramer's termination.  On December 2, 2004, Kramer received an appointment to an unclassified administrative position.  Stephens Decl. Ex. 2.  That appointment was renewed annually through the 2011-2012 fiscal year.  The contract states that it may be "amended by any changes in the . . . SOU Personnel Policies as may apply to the general terms and conditions of employment for employees in this class of employment with the University.  Any such changes to the . . . SOU Personnel Policies immediately amend this contract upon the effective date of adoption of the . . . Policy."  Id. at 2.

I conclude, therefore, that the terms of Kramer's appointment were immediately amended by the adoption of the June 13 amendment.  The June 13 amendment provides that an administrative appointment such as Kramer's could be terminated without cause on ninety days notice.  It is undisputed that Kramer received ninety days of pay and benefits dated from June 25.  Kramer is not entitled to any further remedy under his contract.

Nor would Kramer be entitled to any further remedy, even if the June 13 amendment were not effective at the time of his termination.  Under the superseded 2005 policy, a renewable appointment was "considered renewed" unless the employee received a notice of non-renewal as described in a subsequent section of the policy: "A ninety (90) day notice of non-renewal is given to employees on renewable appointments with termination being effective at the end of the notice period." Moore Decl. Ex. 20, at 2.  The plain language of the policy does not require that the notice of non-renewal actually come ninety days before the end of the employee's term.[7]  On the contrary, so long as the notice of non-renewal is given prior to the end of the employee's term, the employee is entitled to ninety days of employment from the date of the notice and not, as Kramer contends, automatic renewal for a full year of employment.[8]

Accordingly, I conclude that Kramer has already received any benefit to which he was entitled under his contract.  Defendants

---

[7]Kramer's contract states that notice of non-renewal must be given at least two months before the expiration of the existing contract.  Stephens Decl. Ex. 2, at 2.  As noted, however, Kramer's contract is immediately amended by changes to the SOU employment policies.  Id.  Kramer's contract was signed on January 15, 2005.  Id. at 1.  The 2005 employment policy describing notice of non-renewal was approved on September 17, 2005, and would have effectively amended the terms of Kramer's employment on that date.  Moore Decl. Ex. 20, at 1.

[8]This interpretation is consistent with the findings of the SOU Grievance Committee, which considered Kramer's grievance under the terms of the 2005 policy, as opposed to the June 13 amendment.  Stephens Decl. Ex. 9, at 3-4.

26- ORDER

are entitled to summary judgment on this claim.

### F. Statutory Wage and Hour Violations

Kramer's sixth claim for relief alleges that SOU failed to pay all wages earned and unpaid at the time of his discharge as required by Oregon's wage collection statutes, ORS 652.140 *et seq.* Specifically, Kramer contends that the SOU Grievance Committee award constituted wages or compensation earned and unpaid.

ORS 652.150 provides that "if an employer willfully fails to pay any wages or compensation of any employee whose employment ceases . . . then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof at the same hourly rate for eight hours per day until paid or until action therefor is commenced." Compensation under ORS 652.140 *et seq.* refers to a claim for remuneration for services previously rendered. Perri v. Certified Languages Int'l, LLC, 187 Or. App. 76, 88-91 (2003), *overruled on other grounds by*, Cejas Commercial Interiors, Inc. v. Torres-Lizama, 260 Or. App. 87 (2013); Javansalehi v. BF & Assocs., Inc., No. 3:10-CV-850-PK, 2012 WL 1566184, at *4 (D. Or. May 2, 2012). Payments made to satisfy contractual obligations, but not for services actually rendered, are not subject to Oregon's wage collection statutes. Bruce v. S.M. Motor Co., Inc., 81 Or. App. 227, 229-230 (1986); Jones v. Northwest Telemarketing, Inc., No. 99-990-JO, 2000 WL 568352, at *3 (D. Or. Apr. 7, 2001).

In this case, it is undisputed that Kramer did no work for

27 - ORDER

SOU after June 25, 2012.  The pay and benefits awarded by the SOU
Grievance Committee are not, therefore, wages or compensation for
services actually performed.  Rather, the SOU Grievance Committee
award was a payment made pursuant to contractual obligations.
Such awards are not subject to Oregon's wage collection statute.
Defendants are entitled to summary judgment on this claim.

## II. Kramer's Motion for Partial Summary Judgment

Kramer moves for partial summary judgment on Defendants'
second, fourth, sixth, eighth, fifteenth, and seventeenth
affirmative defenses.  At oral argument, Defendants conceded and
withdrew the fifteenth and seventeenth affirmative defenses.  I
accept those concessions.

Defendants' second affirmative defense asserts that the
Amended Complaint fails to state a claim for which relief can be
granted. This motion is moot as to all claims disposed of in this
Order.  As to all remaining claims, this motion is denied.

Defendants' sixth affirmative defense is for breach of
Kramer's duty of loyalty.  Although Kramer argues that public
employees do not owe a duty of loyalty, Oregon courts have
concluded that *every* employee owes his or her employer a duty of
loyalty.  Garvin v. Timber Cutters, Inc., 61 Or. App. 497, 502
(1983).  Kramer's argument that breach of a duty of loyalty is not
a recognized affirmative defense is also unavailing.  See Taylor
v. Berkheimers, Inc., 48 Or. App. 901, 903-07 (1980) (discussing
the implications of an affirmative defense of breach of duty of

28 - ORDER

loyalty).  As to Kramer's factual arguments, I conclude that genuine issues of material fact remain as to this defense and I decline to grant summary judgment.  Similarly, I conclude that there are genuine issues of material fact with regard to Defendant's affirmative defenses of estoppel and unclean hands.

## III. Defendants' Motion for Leave to File an Amended Answer

Defendants move for leave to file an Amended Answer.  Kramer opposes only one of the proposed changes, which would incorporate an eighteenth affirmative defense to Kramer's common-law claim for blacklisting.  Because I have granted summary judgment on Kramer's blacklisting claim, Defendants' motion for leave to amend is MOOT with respect to the eighteenth affirmative defense.  Because Kramer does not oppose any of the other proposed amendments, Defendants' motion is GRANTED with respect to those amendments.

### Conclusion

Defendants' Motion for Partial Summary Judgment(#87) is GRANTED in part.  Plaintiff's Motion for Partial Summary Judgment (#91) is DENIED.  Defendants' Motion for Leave to File an Amended Answer (#84) is GRANTED in part.

IT IS SO ORDERED.

DATED this ___/___ day of December, 2014.

OWEN M. PANNER
U.S. DISTRICT JUDGE

29- ORDER